YAODI HU,                                    )
                                             )
           Plaintiff,                        )
                                             )
    v.                                       )    No. 07 C 3748
                                             )
VILLAGE OF MIDLOTHIAN and TIM                )
HOPKINS,                                     )
                                             )
           Defendants.                       )

## MEMORANDUM OPINION AND ORDER

*Pro se* plaintiff Yaodi Hu's[1] ("Hu") third amended complaint ("complaint") against the Village of Midlothian[2] ("Village") alleges violations of: 42 U.S.C. § 1981 (count I); the First Amendment (count II); the equal protection clause of the Fourteenth Amendment (count III); "Illinois law" (count IV); Article I, section 2 of the Illinois Constitution (count V); the due process clause of the Fourteenth Amendment (count VI); Article I, section 15 of the Illinois Constitution (count VII); "substantive due process" (count VIII); the Fifth Amendment (count IX); 65 ILL. COMP. STAT. 5/1-2-9 and 5/1-2-1 (count X); the equal protection clause of the Fourteenth Amendment (count XII); and the due process clause of

---

[1] Hu frequently files lawsuits. *See Hu v. Huey*, No. 07 C 3822, 2008 WL 2797000, at *1-3 (N.D. Ill. July 18, 2008) (Kendall, J.) (setting forth numerous lawsuits filed by Hu, including the instant action).

[2] In granting the motion to dismiss the first amended complaint in part, I determined that defendant Tim Hopkins is entitled to absolute immunity for his actions, taken in a judicial capacity.

the Fourteenth Amendment (count XIII).[3]  The Village has moved for

summary judgment on all counts.[4]  For the following reasons, the

motion is granted on counts I through III, V through IX, XII, and

XIII.  I decline to exercise supplemental jurisdiction over counts

IV and X, which accordingly are dismissed.

## I.

Hu is of Asian descent.  He has resided at 3258 South Paulina

in Chicago, Illinois since the late 1990s.[5]  Hu owns the commercial

property located at 3352 West 147th Street in Midlothian, Illinois

("property").  Hu is licensed by the state of Illinois as an

insurance broker, and he intends to open and insurance brokerage

office at the property.

The property is improved with a one-story commercial building.

The front of the property consists of a sidewalk that runs parallel

to 147th Street.  The back of the property consists of a gravel

parking lot, which is accessible from an alley behind the building.

Hu attests that the backyard "was never improved as a parking lot"

---

[3]I denied plaintiff leave to file count XI.

[4]Hu opposes the Village's motion, and also moves for summary
judgment on all counts.  I consider Hu's cross-motion materials as
part of his response materials.

[5]Hu attests that, in December 2006, his family relocated to
1533 North Larabee in Chicago.  At his deposition on February 21,
2008, however, Hu stated that he "reside[s] at 3258 South Paulina"
although "sometimes [he] stay[s] some other places."  Hu identified
4104 Archer Avenue and a commercial property at 1115 South 5th
Avenue in Maywood as other places.

and it "was never completely graveled."  Hu also attests that the backyard of the neighboring tavern is "filled completely with [a]sphalt and no grass could possibly grow."  Hu further attests that the backyard of the neighboring barbershop is "similar" to his, and there are "grasses" and "trees."  According to the Village's interrogatory answer, the neighboring properties' vegetation "has always been maintained."

Midlothian Municipal Code ("Code") § 4-18-9(B)(5) ("Vegetation Ordinance") requires that

> All premises shall be appropriately maintained and lawns, hedges, bushes, trees and other vegetation shall be kept trimmed and from becoming overgrown and unsightly where exposed to public view or where such vegetation may constitute a blighting influence on adjoining property. This provision shall not preclude the maintenance of undeveloped or underdeveloped land in its natural state.[6]

Section 4-20-12(A) of the Code states that, "The fines and penalties which shall be imposed for the violation of the Building

---

[6]The Village also attached a copy of a webpage entitled "Village Ordinances: Property Maintenance/Residential Rental Inspections[,]" which states "To give you an idea of what the inspectors will be looking at, we have outlined some of the areas of your building that will be inspected."  Among the items listed is "Grass, Weeds - shall be kept free of plant growth in excess of 8 inches and shall be free of dead plant material."  The Village has not laid the foundation for this document.  Hu attests that when drafting his original and first amended complaints, he searched the Village's website "extensively" and this exhibit was not available; but when drafting his third amended complaint, "there was a lot a [sic] added content on the Village's website" and this exhibit must have been added after his first amended complaint.  As the Village has not addressed this statement nor cited any testimony or affidavit laying a foundation for the document, I do not consider it.

3

Code shall not be less than one hundred dollars ($100.00) nor more than seven hundred fifty dollars ($750.00) for each offense and a separate offense shall be deemed committed on each day during which a violation occurs or continues."

Steve Thornton ("Thornton") was employed by the Village during 2006 and the beginning of 2007 as a building inspector/property maintenance officer. On August 1, 2006, Thornton inspected the property and found the outdoor vegetation was not maintained and overgrown. Specifically, vegetation was growing though the cracks in the sidewalk in front of the building and weeds in the gravel parking lot were five feet tall. Hu attests that, "[a]t the time of the citations, the Village never made it clear to [him] what was the proper height of grass[;]" "the Village never properly noifie[d] [him] as to which part of the sidewalk is [his] responsibility[;]" and he "would also contend that the back of his yard is not visible to the public[.]" Thornton informed Roxanne Huegel ("Huegel"), the Village's Administrative Adjudication Systems Coordinator, of his findings.

On August 1, 2006, Huegel mailed a letter to Hu that advised him that the property had been inspected and was found to violate the Vegetation Ordinance. The Vegetation Ordinance was included with the letter. Hu was notified that he must remove overgrown vegetation within seven days. Thornton conducted a follow-up inspection on August 7, 2006. Thornton noted that the vegetation

in front of the property had been removed, but the rear vegetation had not been cut.  On August 21, 2006, Thornton performed another inspection.  No progress had been made, and he issued Citation No. 701 for violation of the Vegetation Ordinance.  Thornton attests that he did not issue the citation on account of Hu's race.  On August 22, 2006, Huegel mailed a letter to Hu via certified mail, which indicated that the condition of the vegetation on the property was unsatisfactory and enclosed Citation No. 701.  The citation indicated that the hearing date would be September 28, 2006 at 7:00 p.m. at 14801 South Pulaski in Midlothian.  Hu signed the certified mail return receipt.

Hu disputes that the vegetation was overgrown during the August 7, 2006 and August 21, 2006 inspections, attesting that "[a]round August 2006," he hired a handyman "to cut both the front grass and the back grass[,]" and the handyman followed his "instruction of cutting the weeds and reporting back during that time that the grass in both front and back were cut."  When asked about letters dated August 1, 2006 and August 22, 2006, Hu testified that he received "some of those[,]" in response to which

> I believe I went over there and cut the grass several times. I believe the vegetation they mention, some of them is in the front part of the building and I actually hired a handyman to cut them if I get the notice.  And I have some of the -- some of the vegetation . . . has been cut in the back . . . .

The parties agree that, in response to the citation, Hu hired a handyman to cut the vegetation behind the property.  Also, when

asked about the photograph of the back of the property, hand-dated "8-22-06,"[7] Hu testified "If it's 4 feet high, that's certainly high, there's no question about it. Yes, this one 8-22-06 that was probably a little high."

Timothy Hopkins ("Hopkins"), the Village's Hearing Officer, presided over the hearings on Citation No. 701. Hu never appeared at any hearing. Hu testified about the following "combination" of reasons why he never went to any hearing:

> One is probably in the evening, that's kind of external inconvenience. One is probably the travel I have to take going in that direction in the evening. One is probably that, you know, I didn't put on my calendar on a specific date for appearing in that particular court date. I missed a couple of court dates on the City of Chicago traffic court and I end up with my driver's license suspended.[8]

When asked about the letters giving him new court dates and telling him to appear, Hu testified that he "wouldn't say [he] received all

---

[7] Hu objects that no foundation was laid for this picture, and it lacks "typical dates associated with digital camera." Thornton attests that he took the photographs dated August 22, 2006, September 28, 2006, October 12, 2006, November 9, 2006, November 21, 2006, and January 25, 2007 on the dates indicated next to the pictures, and they truly and accurately depict the property on those dates. Thornton also attests that the August 22, 2006 photograph "truly and accurately depicts the rear of the subject property and the condition of the outdoor vegetation on August 21, 2006 and August 22, 2006."

[8] Hu also attests that he did not recall why he failed to appear at the September 26, 2006 hearing, but he "probably overlooked his schedule."

of the following letters."[9]  Hu was sent notice of each fine assessed against him and advised of the continued hearing dates.[10] Hopkins attests that he did not consider Hu's race when determining that the property violated the Vegetation Ordinance or assessing fines.  Hopkins continued the hearings related to Citation No. 701 to ensure that maintenance of the rear vegetation continued and that vegetation was removed from the front of the property. Hopkins also continued assessing fines because no progress was being made as to maintenance, and he wanted to get the owner's attention so he would appear at a hearing.[11]  On February 22, 2007, Citation No. 701 was dismissed.

According to James Connell ("Connell"), Building Superintendent for the Village, Edward Burbank ("Burbank") was employed as a building inspector/property maintenance officer

---

[9]To the extent Hu attests that he "did not receive most of the notice of hearing because he no longer resides at" the Paulina address, his affidavit contradicts his earlier deposition testimony as explained above.

[10]Hu attests that he "did not receive most of the certified mail and mail from the Village[.]"  The Village sent seven letters via certified mail.  Three of those letters were regarding Citation No. 701 discussed above; they include signed return receipts.  Four of those letters were regarding Citation No. 804 discussed below; three do not include return receipts, and one includes a notice that it was returned to sender "unclaimed."

[11]To the extent Hu attests that the handyman "cut grass several times[,]" this is not inconsistent with Hopkins' affidavit which acknowledges that the rear vegetation was cut since Citation No. 701 issued, and at the "October 12, 2008" hearing (the year appears to be a typographical error) he did not impose a fine as "the rear vegetation was in compliance with the code."

during 2007 and 2008, but is no longer employed by the Village. Connell attests that Burbank inspected the property on June 19, 2007, and Citation No. 841 was issued based on the condition of the vegetation.[12] On June 22, 2007, Huegel sent a letter to Hu via certified and regular mail enclosing Citation No. 841, which indicated that a hearing was scheduled on July 26, 2007. Hu attests that he did not receive the June 22, 2007 letter. The certified mail return receipt indicates that the letter was returned to sender "unclaimed." On July 30, 2007, Huegel sent a letter to Hu enclosing the "Finding, Decisions, Order" ("FDO") from the July 26, 2007 hearing. The July 30, 2007 letter stated that the case was continued until August 9, 2007 at 7:00 p.m.

On August 14, 2007, Huegel sent a letter to Hu via certified and regular mail enclosing the August 9, 2007 FDO.[13] The August 14, 2007 letter stated that, if the overgrown vegetation was not removed from the property within seven days, then Public Works

---

[12]The citation indicates that it was issued by Burbank for violation of the Vegetation Ordinance. Connell attests that Burbank found the vegetation in front of and behind the building to be overgrown, specifically with weeds growing higher than five feet in the back and weeds and grass growing through the front sidewalk. But Connell has not established that he can attest to this based on personal knowledge, and the citation contains no such information. Connell also attests that the citation was not issued on account of Hu's race. Again, he has not established that he can attest to this based on personal knowledge. The Village concedes that Connell's "statement as to why Burbank issued Citation No. 841 is technically hearsay[.]" (Def.'s Reply at 5.)

[13]The letter includes a certified mail receipt, but not a return receipt.

would cut the vegetation and a lien would be placed on the property for the costs.[14]  The August 14, 2007 letter also stated that the case was continued until August 23, 2007 at 7:00 p.m.  On August 28, 2007, Huegel sent a letter to Hu, which stated that the August 23 hearing was cancelled and that the case was continued until September 13, 2007 at 7:00 p.m.

In August, the Village cut the vegetation.  On September 11, 2007, Huegel sent Hu a letter via certified and regular mail enclosing a bill for services performed by the Public Works Department.[15]  The September 11, 2007 letter stated that failure to pay the bill by October 22, 2007 would result in a lien being filed against the property.  On September 17, 2007, Huegel sent Hu a letter enclosing the September 13, 2007 FDO.  The September 17, 2007 letter stated that the case was continued until October 11, 2007 at 7:00 p.m.  On October 16, 2007, Huegel sent Hu a letter enclosing the October 11, 2007 FDO.  The October 16, 2007 letter stated that the case was continued until November 8, 2007 at 7:00 p.m.  On November 15, 2007, Huegel sent Hu a letter via certified

---

[14]The letter includes a certified mail receipt, but not a return receipt.  Although Hu responds that he "did not receive that certified mail of August 14, 2007[,]" he does not attest to that fact.

[15]The Village attaches a copy of a $175.00 lien against the property dated December 10, 2007.

and regular mail enclosing the November 8, 2007 FDO.[16]  The November 15, 2007 letter stated that Citation No. 841 was closed pending payment of fines of $2,500.00 and that failure to pay within sixty days would result in a lien being attached to the property.

Hopkins also presided over the hearings on Citation No. 841. Hopkins increased the fines and violation dates because Hu did not appear at the hearings[17] or make any effort to maintain the vegetation[18].  Hopkins continued the hearings after the Village cut the vegetation.   He  continued  to  impose  fines  because  the

---

[16]The letter includes a certified mail receipt, but not a return receipt.

[17]Hu attests that he did not receive "any notice of the hearing" - referring only to the August 14, 2007 letter.  He also attests that he "did not refuse to attend any of the hearing[,]" but he does not claim that he attended any hearings.

[18]Hu attests that he "made many trips" to the property with his handyman "over the years."  He also attests that he "cut the grass personally many time himself in 2007" and his handyman also cut the grass "many times."

vegetation continued to grow without any evidence of maintenance.[19]
Citation No. 841 was closed on November 8, 2007.[20]

The procedures Hopkins took during the hearings on both citations did not deviate from the procedures he takes when vegetation is overgrown on other properties. Hopkins continues all citations even if proof is shown that the property is in compliance with the Code because, if a citation is dismissed and the property owner later fails to maintain the property, then a long period of time elapses before a hearing can be held on a subsequent citation. Hopkins dismisses a citation when the property owner demonstrates understanding of what is required and has continuously maintained the property for the period when a citation is active. For example, there is another property owner, who is Caucasian, with a history of overgrown vegetation. Initially, that property owner failed to appear and no progress was made on the condition of the vegetation. Hopkins continued the hearings for that property more

---

[19]The Village attaches a number of photographs dated digitally or otherwise as follows: June 19, 2007; July 19, 2007; July 26, 2007; August 9, 2007; August 23, 2007; October 11, 2007; and November 8, 2007. Connell attests that Burbank took photographs of the property on June 19, 2007, July 26, 2007, August 9, 2007, August 23, 2007, October 11, 2007, and November 8, 2007, but he has not established that he has personal knowledge to so attest. Connell further attests, however, that he "passed by and informally inspected the subject property on numerous occasions in 2007 and the photographs . . . truly and accurately depict the condition of the subject property during the summer and fall of 2007."

[20]The Village cites an order dated November 8, 2007 signed by Hopkins, indicating "[c]losed pending full fines assessed."

times than for Hu's property. Hopkins also "assessed substantially higher fines against" the other property owner. Hu testified that the factual basis of his allegations that citations were issued and excessive amounts were fined because of his race is his "inference" and his "experience with other jurisdictions on how they handle the grass citations" as well as his "life experience dealing with Midlothian in the last two, three years . . . on different issues."

In 2005, 2006, and 2007, the Village issued twenty-five citations for violating the Vegetation Ordinance, of which fifteen were issued to Caucasians, two were issued to African-Americans, two were issued to Hispanics, two were issued to an Asian (both to Hu), two were issued to Middle Eastern individuals, and two were issued to unknown persons (one of which was a corporation). One property was cited in 2005 and 2006, when owned by different individuals of different races. The largest cumulative amount of fines was $14,800.00, which was assessed and recorded against another property owned by a Caucasian individual.

Section 4-11B of the Code governs signs ("Sign Ordinance").[21] Section 4-11B-2 defines a "projecting sign," in relevant part, as

---

[21]The Village attaches two versions of the Sign Ordinance: Exhibit V, which was in effect when Hu spoke to Connell about a roof sign and was granted a wall sign permit (as set forth below); and Exhibit W, which is currently in effect and was amended in December 2007. The Village represents that the 2007 amendment did not substantively change any of the sections related to roof signs. All citations to and quotations of the Sign Ordinance herein refer to Exhibit V.

"[a]ny sign which is attached to a building or other structure and extends beyond the line of the building or structure or beyond the surface of that portion of the building or structure to which it is attached."  It defines a "roof sign" as "[a]ny sign wholly erected, constructed or maintained upon or above the roof structure or parapet of any building with the principal support attached to the roof structure."  Section 4-11B-5(G) provides as follows

> Roof Signs:  Roof signs which have not been erected prior to the effective date hereof are prohibited.  Subsequent to the effective date hereof, no erection permits will be issued by the Building Department for roof signs.

Section 4-11B-9 states, in relevant part, that "[a]ny sign lawfully existing prior to the enactment of this Chapter, but which could not be erected in accordance with the provisions of this Chapter shall be deemed to be a nonconforming sign and may continue to be in existence" under certain conditions.

Thomas Murawski ("Murawski"), Village President from 1984 to the present, attended a May 26, 1993 meeting about enacting the Sign Ordinance.  Murawski attests that, at the meeting, the Village considered prohibiting roof signs.  Murawski also attests that the basis for prohibiting roof signs was due to aesthetic and safety reasons.  Also, section 4-11B-1 identifies its "purpose" as establishing

> a framework for a comprehensive system of sign controls governing the display, design, construction, installation and maintenance of signs which will:

(A) Balance the right of individuals to identify their businesses and convey their messages and the right of the public to be protected against the unrestricted proliferation of signs.

(B) Protect the public health, safety and welfare.

(C) Reduce traffic hazards.

(D) Enhance the attractiveness of the Village.

(E) Protect property values.

(F) Promote economic development.

(G) Further the objectives of the Comprehensive Plan.

(H) Preserve the right of free speech exercise through the use of signs containing noncommercial messages.

Murawski attests that, in the past, roof signs were the main method of advertising in the commercial corridor. Connell attests that there is no difference between a roof sign and a projecting sign, except for the way it is attached to the building in that roof signs employ the use of a roof structure while projecting signs attach to the face of a building directly. Murawski attests that a roof sign is connected to the roof a building by a structure erected on top of the roof, known as a bracing, which "stood out visually, and in some instances, would span the entire width of a roof top and extend 15' in the air above the roof line."

Murawski attests that the "roof signs were large and visually unattractive[,]" and the prohibition "was a way to enhance the attractiveness of the Village's commercial corridor." Murawski also attests that "[m]ost of the buildings in the Village's

commercial corridor are over 50 years old[,]" and the Village was concerned about "the future structural integrity of the rooftops upon which the bracings were erected; specifically, questions were raised as to ability of the buildings' roofs to hold the weight of roof signs given their age." Murawski further attests that the Village "decided to allow existing roof signs to remain as legal nonconforming signs in order to protect the property and reliance interests of owners who constructed roof signs legally[,]" and "[t]he ordinance provided for the gradual amortization of legal nonconforming roof signs." Murawski attests that, considering the foregoing factors, the Village passed the Sign Ordinance. Connell attests that, when the Sign Ordinance was passed, the Village had more than fifty roof signs; now, the Village has fifteen properties with roof signs. Connell also attests that no permits have been issued for roof signs since the enactment of the Sign Ordinance.

In the summer of 2006, Hu met with Connell about erecting a sign for his business. Connell attests that Hu asked about using an existing or new roof structure for a projected sign, and Connell advised him that such a sign was prohibited by ordinance. Connell also attests that, although Hu referred to the sign as a projected sign, it was "clear" to Connell that Hu was asking for a roof sign as his statements referred "to the use of a roof structure." Connell further attests that the "conversation never included the possibility of erecting a conventional projecting sign[,]" which

attaches "to the face of the building without the use of a roof structure."

Hu testified that he spoke to a man with the Village about using an existing roof structure to hang a projected sign. Hu also testified that his proposal was "only preliminary." Hu further testified that the "structure" did not cost that much to remove and put up another one, but he did not tell the Village that because "they didn't want any kind of a projected sign . . . . "[22] Hu attests that Connell "clearly told Hu that no projected sign were allowed because of a newly passed ordinance" and "also clearly told Hu that no roofing signs were allowed." Hu also attests that Connell stated that "the only projected signs allowed are those with its own standing poles, detached from the wall."

Connell attests that "no conversation was had concerning the size or content of a sign." Connell also attests that Hu's race played no part in his decision to advise Hu that roof signs were not allowed. Hu testified that he has no specific knowledge that his sign was denied because of his race. He also testified that he has no knowledge of any similarly situated non-minorities regarding his sign allegations. Hu further testified that the factual basis of his claim that he was denied a sign because of his race "is that

---

[22]Hu attests that he "made it very clear to [Connell], regardless whether Hu could use the existing roofing structure to support his projected sign, Hu would like to apply for a projected sign attached to the building front wall." This is inconsistent with Hu's deposition testimony.

there are other projected signs still allowed, I assume those people are white people or white business in a white community." Hu did not apply for a roof sign or a projecting sign. On July 10, 2006, Hu applied for a wall sign. A permit was issued, and Hu erected a wall sign.

In March 2007, the Village recognized a large increase in water consumption at the property. As a result, the Village terminated water service to the property. Connell attests that Hu was contacted about "the leak and the lack of water service shortly thereafter." Hu testified that the Village called him and "they shut off [the water] because of the leak." He also testified that there was a leak, which his handyman fixed, but the water was not turned back on. Hu further testified that the Village did not turn the water "on probably because of the lien, but the entire situation certain have a racial component to it." When asked if anyone told him that they did not turn on the water because of the lien, Hu testified that, "They didn't tell me that."[23]

Connell attests that payment of the water bill is required before the restoration of water service, and the Village will not restore service after a known leak until it is "repaired properly by a licensed plumber." Connell further attests that, "This

_____

[23]Hu attests that he had a conversation with Connell in which "[g]rass issues were discussed[]" and "the issue of the $4,000 lien was raised." Hu also attests that "no direct link was insisted by the Village," but he "was left with the impression that unless the lien was paid off, the water would not be turned on."

decreases the probability of future leaks and damage to" property.

Section 4-11-2(A) of the Code ("Plumbing Ordinance") states

> Permit Required: All plumbing construction and all sewerage construction, except the repair of existing plumbing or sewerage not involving alteration of the existing system, shall require a permit.

Hu paid the water bill. Connell attests that Hu's water service was not restored "because no building permit or plumbing permit was applied for or issued to repair the leak and the work was not completed by a licensed plumber." Hu attests that he was never told that he needed to apply for a permit before he could fix the leak or that the reason the water was not turned on was because he did not apply for a permit. Hu contends that a permit was not required under the Plumbing Ordinance because the handyman just replaced a valve. Hu testified that he does not have direct evidence that the Village did not turn on the water because of his race, and he has no knowledge of any similarly situated non-minority who was treated differently than him.

Hu applied for a business license with the Village in November 2005.[24] Business licenses are valid for one year. The purpose of the business license is to ensure that the property is in compliance with Village ordinances before opening to the public. Granting a business license certifies that the property is safe for

---

[24]Connell attests that the license was applied for on November 11, 2005, but the attached application is dated November 8, 2005 and stamped received November 9, 2005.

occupancy by the business owner and the public.  Before a business license is issued, numerous Village departments must inspect the property before it is allowed to open to the public.  After a satisfactory inspection, the license is sent to various Village committees for approval.  The trustee who heads each department must sign off on the license before it is issued.

Connell attests that the "building department was not called upon to conduct an inspection of the subject property in conjunction with a business license application."  Connell also attests that the "Village has no record of an inspection request related to a business license" at the property during the summer of 2007.  Hu testified that he scheduled an inspection for the summer of 2007 - about one month before he filed the initial complaint,[25] but "they didn't show up."[26]

Connell attests that, nevertheless, the condition of the property in the summer of 2007 would have resulted in an unsatisfactory inspection by the building department such that the license would not have been approved.  Specifically, Connell attests that the property is not safe for occupancy due to ongoing

---

[25]Hu's first complaint was filed on July 3, 2007.

[26]Hu attests that the inspection date was June 1, 2007, which he claims is supported by an e-mail sent by his employee, Yessenia Martinez ("Martinez"), that is not attached.  Hu also attests that he "waited at the subject property for about two hours on June 1, 2007."  Martinez attests that on June 1, 2007, "Hu went to Midlothian for building inspection[.]"

construction that was incomplete in 2007 and that remains incomplete. Hu attests that the property was vandalized several months after he filed this lawsuit, but that on June 1, 2007 "all construction work" was complete. Connell also attests that the property had no running water and the vegetation was overgrown. Hu testified that he has no direct knowledge of any similarly situated non-minorities who were granted a business license. Hu testified that the factual basis for his claim that race was a motivating factor in the way he was treated is his "life experience that tells [him] they would have treated a white person different."

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of

20

the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." *See* FED. R. CIV. P. 56(e). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

A. Counts I and XII

Count I alleges that Hu was prevented from opening a business in the Village in violation of § 1981. Hu argues that the Village violated § 1981 by: (1) refusing to turn the water on because he did not obtain a permit to repair the leak; (2) informing him that he could not install a projected sign; (3) denying his business license for more than three years; and (4) refusing to arrange an inspection of the property.

Section 1981 provides that all persons "shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . . " 42 U.S.C. § 1981. For a municipality to be liable under § 1981, a plaintiff must show that its "official policy or custom was discriminatory." *Smith v. Chicago Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1148 (7th Cir. 1999) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736-37 (1989) for "applying to suits under §

1981 the principles devised for § 1983 litigation by *Monell*"[27]); *see*
*Johnson v. Joliet Junior College*, Nos. 06 CV 5086, 06 C 2135, 2009
WL 674357, at * 3 (N.D. Ill. Mar. 13, 2009) (Andersen, J.). To
prove the existence of a discriminatory policy or custom, Hu must
show that: (1) the Village had an express policy that caused a
constitutional deprivation; (2) the Village has a widespread
practice of discrimination that is so permanent and well-settled
that it constitutes a custom or usage; or (3) his injury was caused
by a person with final policy-making authority. *Johnson*, 2009 WL
674357, at * 3 (citing *Monell*, 436 U.S. at 690-91).

Hu has not provided any evidence supporting liability under
any of the three methods of proof on his claims related to the
Village's refusal to turn on his water, denial of his business
license, or failure to conduct an inspection. With regard to the
projected sign, Hu contends he was effectively denied an
application for a projected sign because Connell told him such
signs were prohibited, and Connell is "the Trustee for the
Village[,]" the head of the building department, and a person with
policy-making authority. Hu has adduced no evidence, however, that
Connell had final policy-making authority. Because Hu has failed
to show that the Village had an official policy or custom of

---

[27]*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S.
658 (1978).

discrimination in violation of § 1981, summary judgment is granted for the Village on Count I.

Even if I were to assume, *arguendo*, that Hu could establish *Monell* liability, his § 1981 claim would still fail. To establish a § 1981 claim, Hu must show that (1) he is a member of a racial minority; (2)the Village intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413-14 (7th Cir. 1996). Hu may prove intentional discrimination by either the direct or indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Stewart v. Harrah's Illinois Corp.*, No. 98 C 5550, 2000 WL 988193, at *17 (N.D. Ill. July 18, 2000) (Pallmeyer, J.). To proceed under the indirect method, Hu must present evidence that the Village treated similarly situated individuals outside his protected class more favorably. *See id.*

Hu acknowledges that he presents no evidence of discrimination under the direct method, instead proceeding under the indirect method. With regard to Hu's allegations that citations were issued and excessive amounts were fined in connection with violations of the Vegetation Ordinance because of his race, Hu testified that the only factual basis is his "inference" and his "experience with other jurisdictions on how they handle the grass citations" as well as his "life experience dealing with Midlothian." Hu argues that

the barbershop neighboring his building is similarly situated because there are "grasses" and "trees."  The Village contends that Hu's neighbors' properties have always been maintained.  Even taken in the light most favorable to Hu, he has not adduced evidence that any grass and trees at the neighboring property were overgrown in violation of the Vegetation Ordinance.  Nor has Hu shown that he and his neighbor were similar in other regards, such as receiving citations and failing to appear at hearings.  Therefore, Hu has not made out a *prima facie* case of discrimination under the indirect method regarding the fines for violation of the Vegetation Ordinance under the indirect method.

As far as being denied the opportunity to erect a roof sign because of his race, Hu testified that the only factual basis is the existence of other projected signs that he assumes belong to white people, but he has no knowledge of any similarly situated non-minorities.  With regard to the Village's refusal to turn on his water, Hu testified that he has no knowledge of any similarly situated non-minority who was treated differently than him.  As for the denial of the business license, Hu testified that he has no direct knowledge of any similarly situated non-minorities who were granted a business license, and that the factual basis for his claim that race was a motivating factor in the way he was treated is his "life experience that tells [him] they would have treated a white person different."  With regard to the failure to conduct an

inspection, Hu offers no evidence that any similarly situated non-minority was treated more favorably. Therefore, Hu also has not made out a *prima facie* case of discrimination under the indirect method regarding the denial of the opportunity to erect a roof sign, the refusal to turn on the water, and the denial of a business license.

Count XII alleges violation of the equal protection clause of the Fourteenth Amendment because Hu was "singled out" for violation of the Vegetation Ordinance. Count XII also alleges that the Village engaged in a "concerted and orchestrated campaign of official harassment" due to "malice" toward Hu "as an Asian minority." Construing the complaint liberally, Hu pursues two theories, namely that the Village singled out (1) "minority property owners" for unequal treatment, and (2) Hu as "class of one" for unequal treatment.

The equal protection clause provides for "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (th Cir. 1996) (quotation omitted). "When a state actor turns a blind eye to the [equal protection c]lause's command, aggrieved parties . . . can seek relief pursuant to 42 U.S.C. § 1983." *Id.* "A municipality is liable under § 1983 "when a deprivation of constitutional rights is caused by a municipal policy or custom." *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004)

(citing *Monell*).  As set forth above, there are three ways to demonstrate *Monell* liability.  *See id.*  As with Hu's § 1981 claims, he has presented no evidence of any Village policy or custom.  Therefore, summary judgment is granted for the Village on Count XII.

Even if I were to assume, *arguendo*, that Hu could establish *Monell* liability, his § 1983 claim would still fail.  To establish an equal protection violation, a plaintiff must show discriminatory intent.  *Franklin*, 384 F.3d at 846 (explaining that, to make out *prima facie* case for equal protection violation, plaintiff may not rely on disparate impact claim but must show defendant acted with discriminatory intent); *see Nabozny*, 92 F.3d at 453-54 (explaining that plaintiff must show defendants acted with "nefarious discriminatory purpose" and discriminated against him based on "membership in a definable class" - either intentionally or with deliberate indifference).  Hu has made no such showing.

"A plaintiff may allege an equal protection class-of-one violation when discrimination or unequal treatment is not based on membership in a particular class or group."  *Sellars v. City of Gary*, 453 F.3d 848, 850 (7th Cir. 2006).  To succeed under this theory, Hu must show that he was "(1) intentionally treated differently from others similarly situated and that there is no rational basis for that treatment, or (2) that the government is treating similarly situated individuals differently because of a

'totally illegitimate animus' for the plaintiff." *Aida Food &*
*Liquor, Inc. v. City of Chicago*, 439 F.3d 397, 402-03 (7th Cir.
2006).  Hu has not shown that he has been treated differently than
any similarly situated persons.  Hu also has not produced any
evidence of animus toward him.

## B. Counts II and III

Count II alleges that Section 4-11B-5(G) violates the First
Amendment because it "categorically prohibits all new roof signs
and all new projected signs."  Count III alleges that Section 4-
11B-5(G) violates the equal protection clause of the Fourteenth
Amendment "by allowing existing projecting roof signs while
prohibiting new projecting roof signs[.]"  Section 4-11B-5(G) of
the Code provides as follows

> Roof Signs:  Roof signs which have not been erected prior
> to the effective date hereof are prohibited.  Subsequent
> to the effective date hereof, no erection permits will be
> issued by the Building Department for roof signs.

As an initial matter, the Village conclusorily states that
plaintiff has no standing to assert these claims, citing *Harp*
*Advertising Illinois, Inc. v. Village of Chicago Ridge*, 9 F.3d
1290, 1291-93 (7th Cir. 1993).  The Village does not elaborate.  In
*Harp*, the Seventh Circuit found that the plaintiff lacked standing
where, regardless of the outcome of the lawsuit, it still could not
put up its sign because the sign did not comply with another
uncontested ordinance.  9 F.3d at 1291.  Here, the Village states

that "[t]here is no actual controversy, no overbreadth challenge, plaintiff is not seeking monetary damages, and his injury would not be capable of redress as he has already erected a wall sign." (Def.'s Mem. at 8 n.4.)  The Village fails to explain why the fact that Hu has a wall sign makes his injury incapable of redress.  As such, I do not see how *Harp* applies.

For his First Amendment challenge, Hu argues that Section 4-11B-5(G) regulates commercial speech, does not advance a substantial governmental interest, and is more extensive than necessary to serve that interest. (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 6-8.)  Hu does not argue that Section 4-11B-5(G) imposes an unreasonable restriction on the time, place, or manner of content-neutral speech.  The Village, on the other hand, only addresses the regulation as a time, place, and manner restriction on content neutral speech because it contends that the prohibition on roof signs applies to both commercial and non-commercial signs. The Village does not argue that, if Section 4-11B-5(G) regulates commercial speech, it nonetheless withstands review under that test.

The Sign Ordinance refers to businesses in its stated purpose, and it also refers to advertising multiple times throughout.  Here, Hu's sign would be for a business.  The Village cites a provision of the Sign Ordinance that states: "PROTECTION OF FIRST AMENDMENT RIGHTS: Any sign allowed under this Chapter may contain, in lieu of

any other copy, lawful noncommercial message that does not direct attention to a business operated for a profit or to a commodity or service for sale and that complies with all other requirements of this Chapter."  The Village cites no authority addressing whether such language means that a regulation does not cover commercial speech.

The Village cites *Gen. Auto Serv. Station v. City of Chicago*, in which the Seventh Circuit found that the plaintiff failed to state a claim for the regulation of commercial speech.  526 F.3d 991, 1007 (7th Cir. 2008).  There, the court explained that, although a section of the zoning ordinance banning advertising signs of a certain size regulated commercial speech, the plaintiff only challenged the constitutionality of a separate grandfather provision, which was "not triggered by the commercial content of the sign in question." *Id.*  Here, the situation is similar.  While the Sign Ordinance may regulate commercial speech, Hu does not challenge the Sign Ordinance itself.  Rather, he focuses on Section 4-11B-5(G), which prohibits all roof signs that were not erected prior to a certain date[28] without regard to the speech contained therein.  As such, I find that Hu has not shown that Section 4-11B-5(G) regulates commercial speech.  And, as stated above, Hu has not challenged Section 4-11B-5(G) as a content-neutral time, place, and

---

[28]In addition, Section 4-11B-9 permits any lawfully pre-existing signs to remain as nonconforming signs under certain conditions.

manner restriction on speech. Therefore, I grant the Village's motion for summary judgment on count II.

For his equal protection challenge, Hu argues that Section 4-11B-5(G)'s classification of two categories of roof signs - "those erected before the Ordinance was enacted in 1993 and those would like to be erected after the Ordinance was enacted" - addresses the fundamental right of free speech, and does not survive strict scrutiny review. Hu alternatively contends that the classification does not survive rational basis review. The Village asserts that the classification "is only subject to rational basis review" as "the roof sign prohibition passes [First] Amendment scrutiny[.]"

In reviewing the constitutionality of the ordinance, I must first determine whether it impacts a fundamental right or targets a suspect class. *Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002). If no suspect class or fundamental right is involved, then I use a rational basis test. *Id.* (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)). I will uphold the ordinance if the classification rationally relates to a "legitimate" interest. *Greater Chicago Combine & Ctr. v. City of Chicago*, 431 F.3d 1065, 1072 (7th Cir. 2005); *Eby-Brown*, 295 F.3d at 754. "[A] city's decision to address a problem gradually is rational." *Greater Chicago Combine*, 431 F.3d at 1072 (citation omitted). The plaintiff must "show that it is 'wholly impossible' to relate [the] governmental action to legitimate governmental

objectives[.]" *Id.* at 1072-73. In order to show that the challenged classification is irrational, the plaintiff must negate every conceivable basis that might support it, whether or not it has a foundation in the record. *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000) (citing *Heller*, 509 U.S. at 320-21).

Free speech is not impacted here as the classification has nothing to do with the roof signs' content. Therefore, the classification must only survive rational basis review. The distinction between existing and non-existent roof signs bears a rational relationship to the Village's purpose of eliminating roof signs in the interests of aesthetics and safety as well as exempting pre-existing roof sings to protect the property and reliance interests of those who legally constructed roof signs before the effective date of the Sign Ordinance. As such, Hu has not shown that it is impossible to relate the classification to a legitimate interest. Therefore, I grant the Village's motion for summary judgment on count III.

## C. Counts V and VI

Count VI alleges that the Vegetation Ordinance violates the due process clause of the Fourteenth Amendment because it is unconstitutionally vague. Count V similarly alleges that the Vegetation Ordinance violates the due process clause of Article I, section 2 of the Illinois Constitution because it is unconstitutionally vague. Hu argues that "[t]he Village had no

policy of 8 inches at the time" he was issued citations, without which there was no notice of what was prohibited. The Village argues that the "void-for-vagueness" challenge of the Vegetation Ordinance fails because (1) a person of ordinary intelligence would know that weeds in excess of four feet are overgrown; (2) the August 1, 2006 letter provided Hu with actual notice that the property violated the Vegetation Ordinance; and (3) the Village publishes a standard for determining whether grass and weeds are overgrown on its website.

A rule, regulation, or law can be facially unconstitutional as "impermissibly vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001) (citation omitted).[29] To succeed, the plaintiff must demonstrate that the law is impermissibly vague in all its applications. *Id.* at 666-67 (quoting *Vill. of Hoffman Estates v.*

---

[29]*See also People v. Burpo*, 164 Ill.2d 261, 265-66, 647 N.E.2d 996, 999 (Ill. 1995) (stating that statute violates due process under the federal or Illinois constitutions based on vagueness "only if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts[]"). Hu cites *People v. Hightower*, 172 Ill. App. 3d 678, 683, 526 N.E.2d 1129, 1131 (Ill. App. Ct. 1988), for the proposition that the Illinois constitution may provide more protection than the federal constitution, but he does not argue that the Illinois constitution affords more protection here.

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)).  An enactment regulating economic behavior demands less definiteness than one imposing criminal sanctions.  *Id.* at 667.  A plaintiff who engages in conduct that is clearly proscribed cannot complain of vagueness as applied to others' conduct.  *Id.*

The Vegetation Ordinance requires that all premises "be appropriately maintained" and that vegetation "be kept trimmed and from becoming overgrown and unsightly where exposed to public view or where such vegetation may constitute a blighting influence on adjoining property."  Even if the meaning over "overgrown" were unclear, Hu had actual notice that the property violated the Vegetation Ordinance before any citation issued. *See United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 987-88 (7th Cir. 1999)[30] (concluding that regulation was not unconstitutionally vague, and additionally that "fundamental weakness" - to extent certain language in regulation was unclear - was that defendant received actual notice prior to accident that its practice did not comply with Occupational Safety and Health Act regulation was sufficient to satisfy due process considerations).  The August 1, 2006 letter, which Hu does not specifically deny receiving, advised Hu that the

---

[30]Because *Pitt-Des Moines* was a criminal action, the regulation at issue there was required to be even more definite than in instant case.  *See Fuller*, 251 F.3d at 667 (explaining that enactment imposing criminal sanctions demands more definiteness than one regulating economic behavior).

property violated the Vegetation Ordinance and that he must remove the overgrown vegetation within seven days. Two subsequent inspections revealed that the vegetation in the back of the property had not been cut, after which the first citation issued. Although Hu attests that "[a]round August 2006," he hired a handyman "to cut both the front grass and the back grass[,]" Hu testified that, at the time the first citation issued, a photograph of the back of the property showed that the vegetation was "high."

Taken in the light most favorable to Hu, the facts show that he had actual notice of the violation. As such, I find that there was no due process violation. Therefore, summary judgment is granted for the Village on counts V and VI.

## D. Counts VII, VIII, and IX

Count IX alleges that the Village's denial of his business license constitutes a temporary regulatory taking in violation of the Fifth Amendment. Count VII alleges that the Village's denial of his business license constitutes a "regulatory taking or inverse condemnation" in violation of Article I, section 15 of the Illinois Constitution. Count VIII alleges that the Village's denial of his business license violates substantive due process.

The Village argues that the federal takings claim is not ripe for adjudication.[31] "If a state has a procedure in place to

---

[31]Hu does not dispute this, arguing that I should exercise supplemental jurisdiction over count IX pursuant to 28 U.S.C. §

compensate landowners for takings, regulatory and otherwise, then the property owner's Fifth Amendment rights have not been violated until the state process is completed and the owner has still been denied just compensation." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 543 (7th Cir. 2008) (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985)). The Seventh Circuit reads *Williamson County* broadly, also rejecting attempts to label takings claims as substantive due process claims and requiring ripeness. *Id.* (citing *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000)). I find that the Village's challenge applies to the takings claims[32] as well as the substantive due process claims, and I conclude that I do not have subject matter jurisdiction over these counts. Therefore, I grant the Village's motion for summary judgment on counts VII through IX.

---

1367.

[32]The federal and Illinois constitutions provide that private property shall not be taken for public use without just compensation. The Illinois constitutional claim is analyzed under the same standard as the federal constitutional claim. *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 363 (7th Cr. 1998). The Illinois constitution's takings clause provides for greater protection than its federal counterpart in that it also guards against governmental damage to private property. *Id.* at 362-63 (7th Cr. 1998) (citing Ill. Const. art. I, § 15). Here, Hu is not seeking compensation for damage; he has not made, and cannot make, any showing of an actual physical invasion onto his property. *See id.* at 363.

E. Count XIII

Count XIII alleges that Section 4-20-12(A) of the Code violates the due process clause of the Fourteenth Amendment because new fines are imposed without providing notice and an opportunity to be heard. Section 4-20-12(A) provides that the fines and penalties imposed for violating the Building Code will be no less than $100.00 and no more than $750.00 per offense "and a separate offense shall be deemed committed on each day during which a violation occurs or continues."

"The government may not deprive a person of life, liberty, or property without due process of law." *Clancy v. Office of Foreign Assets Control of United States Dep't of Treasury*, 559 F.3d 595, 600 (7th Cir. 2009) (citing U.S. Const. amend. XIV, § 1). "To succeed on a procedural due process claim, a plaintiff must demonstrate a cognizable property interest, a deprivation of that property interest, and a denial of due process." *Id.* (citation omitted). "The fundamental requirement of due process is 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Determining what procedures are necessary to ensure that a person is not deprived of property without due process requires balancing: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value, if

any, of additional or substitute procedural safeguards; and (3) the government's interest. *Id.* (citing *Mathews*, 424 U.S. at 333).

The Village does not dispute that Hu has an interest in his money, so the only question is whether the procedural safeguards are sufficient to protect that interest. *See id.* Hu bases his due process argument solely on his contention that he did not receive the initial notice of Citation No. 841. The facts taken in the light most favorable to Hu support his position. Hu attests that he did not receive the June 22, 2007 letter enclosing Citation No. 841, which indicated that a hearing was scheduled on July 26, 2007; and the certified mail return receipt indicates that the June 22, 2007 letter was returned to sender "unclaimed."

Hu generally attests that he did not receive "most" of the mail from the Village. To the extent Hu attributes his failure to receive mail to not residing at the Paulina address, the record does not support such a claim. There is no specific evidence in the record that Hu did not receive the July 30, 2007 letter, which stated that the case was continued until August 9, 2007. There is also no specific evidence in the record that Hu did not receive the August 14, 2007 letter, which stated that he had seven days to remove the overgrown vegetation and that the case was continued until August 23, 2007.[33] There is also no specific evidence in the

---

[33]To the extent that Hu claims he did not receive this particular letter, he fails to attest to this fact or to support it

record that Hu did not receive any of the subsequent letters regarding Citation No. 841. Nor is there evidence in the record that Hu responded to the July 30 or August 14 (or any of the subsequent) letters in any way nor that he attended any hearing. These facts do not demonstrate that the Village denied Hu a meaningful opportunity to be heard. These facts also do not demonstrate a risk of erroneous deprivation through the procedures used, nor any value in additional or different procedures. Therefore, summary judgment is granted for the Village on count XIII.

### F. Counts IV and X

Count IV alleges that Section 4-11B-5(G) violates "Illinois law" as an invalid "exercise of the police power[.]"[34] Count X alleges that Section 4-20-12(A) violates Illinois statutory law, 65 ILL. COMP. STAT. 5/1-2-9 and 5/1-2-1. Because I grant summary judgment for the Village on the federal claims, I decline to exercise supplemental jurisdiction over these state law claims. Accordingly, counts IV and X are dismissed.

---

with any other record support.

[34]The Village concludes that summary judgment should be entered for it on count IV because Section 4-11B-5(G) necessarily is rationally related to a legitimate governmental interest under Illinois law since it passes First Amendment (count II) and equal protection (count III) scrutiny. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 10.) The Village cites no supporting authority.

IV.

For the foregoing reasons, the Village's motion for summary judgment is granted on counts I through III, V through IX, XII, and XIII.  I decline to exercise supplemental jurisdiction over counts IV and X, which accordingly are dismissed.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated:    May 14, 2009